Deborah A. STILL and William B. Still, Appellants,

v.

Janet L. AHNEMANN, M.D. and The Wetzel Clinic, Inc., Respondents.

No. WD 55263.

Missouri Court of Appeals, Western District.

Submitted Sept. 16, 1998.

Decided Jan. 26, 1999.

court's judgment in favor of Dr. Janet L. Ahnemann and the Wetzel Clinic ("the Clinic"). The Stills raise two points on appeal. First, they claim that the trial court erred in excluding portions of Dr. Ahnemann's videotaped testimony. The Stills also contend that the trial court erred in withdrawing their claim for future non-economic damages. The judgment of the trial court is affirmed.

## Factual Background

In the fall of 1993, thirty-five year old Deborah Still was in the early stages of pregnancy with her second child. Mrs. Still's family physician at the Wetzel Clinic in Clinton, Missouri, retired in October, 1993. Dr. Janet Ahnemann began working at the Clinic on November 1, 1993. Mrs. Still's first appointment with Dr. Ahnemann was on November 19, 1993. Mrs. Still was fifteen weeks pregnant at the time.

On February 10, 1994, some thirteen or fourteen weeks after her first appointment, Mrs. Still saw Dr. Ahnemann for a routine obstetric examination. Before Mrs. Still saw Dr. Ahnemann, the doctor's medical assistants checked Mrs. Still's weight, blood sugar and the amount of protein in her urine. It is routine to check these three factors in every pregnant patient because excessive weight gain (from swelling), increased blood pressure and significant amounts of protein in the urine are clinical indicators of preeclampsia. Mrs. Still's weight gain was two pounds more than her weight gain in the corresponding week of her first pregnancy. Mrs. Still's blood pressure was $120/80$, compared to 124/80 at the beginning of her pregnancy. Only a trace of protein was found in Mrs. Still's urine.

Mrs. Still's next visit with Dr. Ahnemann was on March 24, 1994. During this visit, Dr. Ahnemann noticed a trace of dependent edema, a swelling of the feet and legs. Mrs. Still had experienced dependent edema during her first pregnancy as well. Additionally, Dr. Ahnemann recorded Mrs. Still's blood pressure at $126/80$ and noted that it was borderline high. At trial, both plaintiff and defense experts testified that Mrs. Still's blood pressure was normal for her condition.

Kent Sellers, Kansas City, for appellants.

Chris F. Pickering, Kansas City, for respondent.

Before SMART, P.J., ELLIS and HOWARD, JJ.

JAMES M. SMART, Jr., Judge.

In this medical malpractice case, Plaintiffs Deborah and William Still appeal the trial

Mrs. Still's next scheduled appointment with Dr. Ahnemann was on April 7, 1994. When Mrs. Still arrived that day, she discovered Dr. Ahnemann was not at the clinic. Dr. Ahnemann was absent because she determined there was an immediate need to meet with a lawyer to institute a dissolution of marriage. On the morning of April 7, her husband had told her he was filing for divorce. Believing she would have an advantage in the issue of child custody if she filed first, Dr. Ahnemann decided to file for divorce from her husband that day. She went to the hospital to check on her patients and then spoke with the Clinic's administrator about her situation. The administrator arranged for Dr. Ahnemann to see an attorney that morning and assured her that her patients would be cared for. Dr. Ahnemann then informed her medical assistants of the need for all of her appointments for that day to be rescheduled. Her medical assistants began calling and rescheduling Dr. Ahnemann's appointments, but were unable to reach Mrs. Still before she arrived at the Clinic to see Dr. Ahnemann.

When Mrs. Still arrived at the Clinic, she informed one of Dr. Ahnemann's medical assistants that she had a cold, cough, sore throat and fever. She also told the nurse that Mr. Still and their son were suffering from the same symptoms. The nurse asked Mrs. Still if she wanted to see another physician. Mrs. Still declined the offer, but requested a prescription for herself, her husband and her son. The nurse consulted another obstetrician at the Clinic, and he prescribed medication for the Still family. The nurse then rescheduled Mrs. Still's appointment with Dr. Ahnemann for April 13, 1994.

On April 11, 1994, Dr. Ahnemann saw patients at the Clinic all day and was busy all night at the hospital with a patient who was in labor. On April 12, Dr. Ahnemann went directly from the hospital to the Clinic to see patients. During an obstetrical examination, one of Dr. Ahnemann's patient's water broke. Dr. Ahnemann checked this patient into the hospital, anticipating another all-night ordeal. Because she had been awake for two days straight, Dr. Ahnemann requested that her medical assistants call and reschedule her April 13 appointments, including Mrs. Still's appointment. Mrs. Still's appointment was rescheduled to April 15, 1994.

On April 15, 1994, Dr. Ahnemann saw Mrs. Still at the Clinic. Dr. Ahnemann's clinical examination on that date revealed that Mrs. Still had gained nine-and-one-half pounds since her last appointment, three weeks earlier. Mrs. Still's blood pressure had increased, and she had a significant amount of protein in her urine. Dr. Ahnemann believed Mrs. Still was developing preeclampsia. According to the medical testimony in the case, preeclampsia can be conclusively diagnosed only by taking blood pressure readings six hours apart after bed rest. The only cure for preeclampsia is delivery of the child. Based upon her diagnosis, Dr. Ahnemann admitted Mrs. Still to Golden Valley Hospital for bed rest, further testing and monitoring of Mrs. Still's blood pressure. Throughout the afternoon, Mrs. Still's blood pressure increased as did the level of protein in her urine. Dr. Ahnemann concluded it was not a severe case of preeclampsia. At this point, Dr. Ahnemann's plan was to continue monitoring Mrs. Still and hopefully achieve a natural delivery before a cesarean section became necessary.

Later that day, Dr. Ahnemann concluded that Mrs. Still had to deliver her child in order to cure the preeclampsia. She was concerned that if Mrs. Still had a protracted natural delivery she could develop severe preeclampsia. Dr. Ahnemann spoke with Mrs. Still about her concerns and they both decided that Mrs. Still should have a cesarean section. A cesarean section was performed that evening, and Mrs. Still delivered a healthy baby girl. After the surgery, Mrs. Still was taken to a recovery room where her blood pressure stabilized and all other signs appeared normal. Dr. Ahnemann left the hospital between 11:00 p.m. and midnight, leaving orders for Mrs. Still's post-operative care with the hospital.

At approximately 2:30 a.m., Dr. Ahnemann received a phone call from the hospital telling her that Mrs. Still's blood pressure had dropped and she was experiencing vaginal bleeding. Dr. Ahnemann ordered several lab

tests for Mrs. Still, prescribed medication for her and then left for the hospital. When she arrived at the hospital and received the results of Mrs. Still's lab tests, Dr. Ahnemann concluded that Mrs. Still might be going into HELLP Syndrome, a very severe form of preeclampsia. HELLP stands for Hemolysis, Elevated Liver Enzymes & Low Platelets. She transferred Mrs. Still to the intensive care unit for closer observation. Dr. Ahnemann consulted with a perinatologist (a specialist in high risk obstetrics), Dr. Tracy Cowles, who told her that Mrs. Still's condition would probably worsen, but such patients usually turned around and got better. Dr. Cowles prescribed a blood transfusion for Mrs. Still and advised Dr. Ahnemann to monitor the liver enzymes and clotting factors in Mrs. Still's blood. Dr. Ahnemann followed Dr. Cowles' advice.

Mrs. Still's condition continued to worsen. Her liver enzymes were increasing, her platelet count was dropping, her kidneys were failing and the bleeding continued. Dr. Ahnemann again consulted Dr. Cowles, who advised Dr. Ahnemann to stay the course. After Mrs. Still's condition continued to deteriorate, Dr. Ahnemann ordered her transferred, via helicopter, to K.U. Medical Center. Mrs. Still left the hospital suffering from HELLP Syndrome accompanied by acute renal failure, respiratory distress and postpartum bleeding. Mrs. Still was admitted to K.U. Medical Center in very critical condition, and doctors advised her family that "more than likely she wasn't going to make it."

While at K.U. Medical Center, Mrs. Still experienced numerous complications stemming from her severe preeclampsia, including kidney failure, liver failure, respiratory failure and heart failure. Upon her arrival at K.U. Medical Center, Mrs. Still was placed on a respirator and remained on it for a week. She underwent weeks of kidney dialysis. Mrs. Still eventually developed a fungal infection for which she was treated with amphotericin. This medication resulted in violent side effects in the form of chills and fever. After three and one-half weeks in intensive care, Mrs. Still was transferred to a regular hospital room at K.U. Medical Cen-

ter. After another week and one-half, she was released altogether. Although Mrs. Still admits that there was nothing she could do before her second pregnancy that she is unable to do now, she continues to complain of fatigue and shortness of breath.

### The Action

On April 2, 1996, Mr. and Mrs. Still sued Dr. Ahnemann and the Wetzel Clinic for negligence and loss of consortium. In this petition, the Stills alleged, *inter alia,* that Dr. Ahnemann was negligent in failing to adequately monitor Mrs. Still's condition, failing to provide medical care at appropriate intervals, and failing to diagnose preeclampsia prior to April 15, 1994. The Stills alleged that Wetzel Clinic failed to ensure that Mrs. Still received adequate care from Dr. Ahnemann, and failed to make sure that appropriate care was provided in Dr. Ahnemann's absence. At trial, plaintiffs' expert, Dr. Bruce Harris, testified that in his opinion if Dr. Ahnemann had delivered Mrs. Still earlier on April 15, 1994, Mrs. Still probably would not have developed HELLP Syndrome. A defense expert, Dr. John Yeast, testified that the prenatal care provided to Mrs. Still was appropriate and in no way led to her later complications with HELLP Syndrome. He also testified that the care Mrs. Still received at the Golden Valley Hospital was appropriate, and Dr. Ahnemann's decision to transfer Mrs. Still to K.U. Medical Center was timely. Dr. Yeast testified that in his expert opinion, Mrs. Still suffered from a severe form of preeclampsia which could not have been recognized earlier.

At trial, the Stills sought to introduce into evidence, and to present to the jury, large excerpts from Dr. Ahnemann's videotaped deposition taken before trial. The trial court allowed many excerpts from the deposition to be admitted. The court, however, sustained the objections of the defendant to the admission of certain deposition excerpts.

The Stills' case was submitted to a jury on the theories that Dr. Ahnemann and the Clinic failed to properly monitor or test Mrs. Still for hypertension or preeclampsia at appropriate intervals, failed to provide or arrange for prenatal care for Mrs. Still at

appropriate intervals, failed to timely deliver Mrs. Still's baby and failed to exercise appropriate supervision over employees. After hearing the evidence, the jury returned a verdict in favor of Dr. Ahnemann and the Wetzel Clinic on October 14, 1997. The Stills moved for a new trial, and their motion was denied.

### Issues

The Stills raise two points on appeal. First, they contend the trial court erred in excluding excerpts from the videotaped deposition of Dr. Ahnemann offered by the Stills because the excluded excerpts were relevant to central issues of liability and were not subject to any valid objection. The Stills contend that this error entitles them to a new trial because they were prejudicially denied the right to present their case according to their own trial strategy. The Stills' second point on appeal is that the trial court erred in withdrawing their claim for future non-economic damages because the evidence was sufficient to establish a causal link between Dr. Ahnemann's actions and Mrs. Still's complications from preeclampsia. Again, the Stills claim this error entitles them to a new trial because Mrs. Still's credibility was harmed by the withdrawal of her claim, and she was the plaintiffs' key witness on issues of liability surrounding Dr. Ahnemann's cancellation of Mrs. Still's prenatal visits.

### Standard of Review—Evidence Rulings

■ Our review of the admission or exclusion of evidence is limited to an abuse of discretion standard. *Oldaker v. Peters*, 817 S.W.2d 245, 250 (Mo. banc 1991). The focus is not on whether the evidence was admissible, but on whether the trial court abused its discretion in excluding the evidence. *Lohmann v. Norfolk & W. Ry.*, 948 S.W.2d 659, 671 (Mo.App.1997). Discretionary rulings are presumed to be correct; we reverse only on a showing that the trial court has abused its discretion. *Anglim v. Missouri Pac. R.*, 832 S.W.2d 298, 303 (Mo. banc 1992). We

will find no abuse of discretion in excluding evidence unless the materiality and probative value of the evidence were sufficiently clear, and the risk of confusion and prejudice so minimal, that we could say that it was an abuse of discretion to exclude it. *See Mead v. Grass*, 461 S.W.2d 708, 710 (Mo.1971).

### Exclusion of Deposition Excerpts

■ "At the trial ..., any part or all of a deposition, so far as admissible under the rules of evidence ... may be used against any party who was present or represented at the taking of the deposition...." Rule 57.07(a). "The deposition of a party ... may be used by an adverse party for any purpose." Rule 57.07(a)(2). The deposition of an opponent may be introduced as an admission even if the opponent has also testified in person. *Teachenor v. DePriest*, 600 S.W.2d 122, 125 (Mo.App.1980).

Admissions by a party opponent are not hearsay. *See Bynote v. National Super Markets, Inc.*, 891 S.W.2d 117, 123–24 (Mo. banc 1995); *see also* Fed.R.Evid. 801(d)(2). In order to qualify as a non-hearsay admission, the statement must be offered against the party and it must be the party's own statement. *Id.* There is no logical reason to require that the admission be "against interest" although admissions of an opposing party are often referred to as "admissions against interest." *See, e.g., Teachenor*, 600 S.W.2d at 125.[1] Because a statement would not be offered unless the offering party deemed it to be unfavorable to the party-opponent, practically speaking the only test for admissibility is relevancy. *Egelhoff v. Holt*, 875 S.W.2d 543, 551 (Mo. banc 1994) ("The only requirement for an admission is that it be a relevant statement of a party offered by the party's opponent."); *see also Brown*, 833 S.W.2d at 439 n. 1.

In the case at hand, the Stills contend that the trial court erred in excluding portions of Dr. Ahnemann's video-taped deposition testimony because the court mistakenly thought

1. The distinction between "declarations against interest" and "admissions of a party-opponent" is discussed in *United Servs. of Am., Inc., v. Empire Bank*, 726 S.W.2d 439, 443–44 (Mo.App. 1987). *See also State v. Brown*, 833 S.W.2d 436, 438–39 (Mo.App.1992). A helpful discussion of admissions in general appears at IV Wigmore, Evidence § 1048 at 4 (1972).

that the admissions would not be admissible unless shown to be inconsistent with her position at trial or shown to contradict earlier testimony. The Stills assert that the excluded portions of Dr. Ahnemann's deposition were relevant to central issues of liability and were not subject to any valid evidentiary objection. In response, Dr. Ahnemann contends that the excluded excerpts of the deposition videotape were inadmissible in that they did not constitute admissions because they did not relate directly to the Stills' claims against Dr. Ahnemann. Dr. Ahnemann further contends that the excluded excerpts were inadmissible because they were not inconsistent with her trial testimony. In short, Dr. Ahnemann contends that the excerpts in question were not relevant.

### Excerpt No. 1

■ The first excerpt of Dr. Ahnemann's video-taped deposition that was excluded pertained to Dr. Ahnemann's procedure for rescheduling cancelled appointments. Counsel asked Dr. Ahnemann:

Have you—since Debbie's incident, have you considered whether the procedures applicable to rescheduling of patients whose appointments are canceled is adequate here at the clinic?

Dr. Ahnemann responded:

I haven't particularly thought about whether it's adequate or not. The same—this is a clinic operation here and when patients need to be rescheduled, if they're ill, they're seen by another physician that day, if they have complaints, they're seen by another physician that day, if it's routine, then they are rescheduled when the patient—it is convenient for the patient to come back in.

The trial court excluded the testimony. The Stills contend that this deposition testimony shows Dr. Ahnemann's indifference to her patients' needs and her lack of diligence as a

physician. The Stills further contend that Dr. Ahnemann's failure to answer the question and her demeanor in evading the question are relevant to the Stills' claims against her. They point to the fact that a witness' demeanor while testifying may raise doubts in the jury as to the witness' sincerity or credibility, citing *Beckemeier v. Baessler*, 270 S.W.2d 782, 787 (Mo.1954).

The question posed to Dr. Ahnemann called for her reflection as to the adequacy of the Clinic's rescheduling procedures. Dr. Ahnemann, a junior physician at the Clinic, answered that she had not previously evaluated the adequacy of the Clinic's procedures. She then recited the procedures, apparently satisfying herself that the procedures were adequate. We believe that Dr. Ahnemann's lack of previous consideration of the adequacy of the rescheduling procedures is, at best, minimally relevant to the Stills' claims against Dr. Ahnemann relating to her alleged malpractice. The Stills present us with no information establishing that there would be a duty upon a junior physician joining an established clinic to evaluate and challenge the clinic's customary procedures when no particular problem has manifested itself. We believe the question and answer are also minimally relevant to the claims against the Wetzel Clinic. Plaintiffs had not specifically pleaded that the rescheduling procedures were inadequate, nor did they seek to submit a specific claim concerning the adequacy of the procedures. While the deposition excerpt may have been vaguely material to the overall case, the Stills fail to persuade us that the excerpt has probative value.[2] The standard by which we review the trial court's decision is that of an abuse of discretion. Thus, our focus is not on the admissibility of the evidence, but on whether the trial court's exclusion of the evidence was an abuse of discretion. *Lohmann*, 948 S.W.2d at 671. Even if we might have been inclined to allow

---

2. Materiality is the concept of whether the offered item relates in any way to the matters in issue in the litigation. McCormick on Evidence, § 185 (3d ed.1984). Relevance deals with whether the offered item bears on the issues of the case in such a way as to make a disputed proposition more likely to be true, or less likely to be true. Relevant evidence is evidence which has a logical

tendency "to prove a fact in issue or corroborate relevant evidence that bears on the principal issue." *State v. Weaver*, 912 S.W.2d 499, 510 (Mo. banc 1995). Thus, a relevant item is one which is not only material, but also has some degree of probative value as to a matter in dispute. McCormick, *supra*, § 185.

the evidence, there is no abuse of discretion in excluding evidence unless the evidence was clearly admissible and the probative value was shown to be substantial. *See State v. Morrow,* 968 S.W.2d 100, 106 (Mo. banc 1998) (court will reverse only if error so prejudicial as to result in denial of fair trial). We see no abuse of discretion here.

### Excerpt No. 2

■ The second excerpt of Dr. Ahnemann's deposition testimony that was excluded involved a question directed to Dr. Ahnemann's belief as to whether she owed Mrs. Still a duty to make arrangements for Mrs. Still to see another physician on April 7, 1994, when Dr. Ahnemann cancelled her appointment. Dr. Ahnemann responded to the plaintiffs' question:

It is impossible to make an arrangement when you are not there. In a clinic operation, the nursing assistants reschedule the patients, they have the availability of every other physician in the clinic to consult with in terms of having that patient seen. We all cover for each other.... [The nursing assistants] had other physicians that they could talk to about the patient to make decisions.

Counsel then asked:

As of today, does it appear to you that your—that the care that you rendered to Debbie Still from April 7, 1994 through April 16, 1994 was appropriate?

Dr. Ahnemann paused, and then answered, "Yes." The Stills contend this testimony is relevant to the issue of Dr. Ahnemann's duty to make sure that Mrs. Still was seen by another physician on April 7, 1994. Additionally, the Stills claim that Dr. Ahnemann paused before answering whether she thought her care of Mrs. Still was appropriate and that they were prejudiced by the jury not being able to view this pause.

While this excerpt of Dr. Ahnemann's testimony also had some materiality, we again fail to see any meaningful degree of relevance to either the first or the record portion of this excerpt. Dr. Ahnemann's response to the first question was vague and general, and did not directly answer the question. The content of her answer was very unremarka-

ble. We fail to see the significance of the response. The second portion of the excerpt, containing Dr. Ahnemann's response that the care was appropriate, simply restated the position Dr. Ahnemann took at trial. Therefore, only the pause before answering was arguably pertinent. We do not see how the inability of the jury to observe the pause before Dr. Ahnemann answered this question was highly significant. In our review of the videotape, we observed that Dr. Ahnemann paused for approximately six seconds, then answered resolutely. We found the pause to be quite unremarkable, and indicated simply the witness's reflection on the question. The Stills fail to set forth clear and concise grounds for concluding that this portion of the deposition had any real significance to their case. We cannot say that the trial court excluded clearly admissible evidence which bore substantial relevance to the issues. We find no abuse of discretion.

### Excerpt No. 3

■ The final excerpt of Dr. Ahnemann's video-taped deposition testimony that was excluded by the trial court involved testimony regarding the marital problems Dr. Ahnemann was having and the Clinic's proposed approach to them. The trial court excluded Dr. Ahnemann's testimony that "[the Clinic was] going to try to handle [the divorce] delicately so that it would not embarrass [her] in public."

The Stills claim that the trial court's exclusion of this portion of Dr. Ahnemann's deposition prejudiced their ability to present their case in the manner they deemed most effective. In lieu of cross examining Dr. Ahnemann on the stand, the Stills chose to present the doctor's videotaped deposition. While it can be said that a party has the right to present their case in any judicially acceptable manner, *United Servs.,* 726 S.W.2d at 445, it is also true that such right is subject to the trial court's right and duty to exercise its discretion to exclude evidence it believes may "confuse or sidetrack the jury." *Kelly v. Jackson,* 798 S.W.2d 699, 704 (Mo. banc 1990) (court may exclude evidence which may be confusing or which may have prejudicial effect, even though evidence is

logically relevant, where risk of confusion or prejudice outweighs probative value). The principle is well stated by the Federal Rules: "Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." Fed.R.Evid. 403. Even if the trial court excluded the evidence for the nominal reason that excerpts were not "admissions against interest," the trial court was actually thinking in terms of specific kinds of relevance. The trial court will not be reversed under an abuse of discretion standard unless we find the ruling to be so unreasonable, and the effect of the ruling so likely to be prejudicial, that reversal is warranted. As to Dr. Ahnemann's statement that the Clinic wished to handle the divorce delicately so as to save Dr. Ahnemann from embarrassment, we are wholly unable to understand the Stills' attempt to explain the probative value of the statement. Whatever relevance there may be is so elusive to us as to cause us to conclude that exclusion of this item was not an abuse of discretion.

### Claim for Future Non–Economic Damages

■ The Stills next claim that the trial court erred in withdrawing their claim for future non-economic damages because the medical and lay evidence presented in the case was sufficient to establish a causal link between Dr. Ahnemann's negligence and Mrs. Still's complications from the preeclampsia, including extreme fatigue and shortness of breath, which Mrs. Still was experiencing three years after the incident. Ordinarily, where a jury has determined that the defendants acted without legal fault, there is no need to consider contentions which relate to damage submissions because such contentions are moot. *State Farm Mut. Ins. Co. v. DeCaigney,* 927 S.W.2d 907, 912 (Mo.App.1996). In this case, the Stills seek to gain review of their contention by relating it to issues of credibility. The Stills claim that they were prejudiced as to the jury's liability determination by the erroneous withdrawal of this claim because it harmed the credibility of Mrs. Still, the Stills' key witness on the issue of liability surrounding Dr. Ahnemann's cancellation of Mrs. Stills' prenatal visits. They contend that the jury would have been more likely to determine the liability issues in their favor if the court had not withdrawn part of their damage claim.

■ Respondents argue that the matter is not reviewable, and that at most, it could be considered only under a "plain error" standard of review because the appellants violated Rule 84.04(e) by not including the language of the challenged withdrawal instruction in the argument portion of their brief. However, because the precise wording of the instruction is not at issue here, our review of the Stills' second point on appeal is not hampered by the absence of the exact language of the withdrawal instruction from their brief. *See State v. Hopson,* 891 S.W.2d 851, 852 (Mo.App.1995).

■ The court may withdraw an issue when evidence has been presented on the issue but there is inadequate proof on the issue for submission to the jury. *Stevens v. Craft,* 956 S.W.2d 351, 355 (Mo.App.1997) (citing *Arnold v. Ingersoll–Rand Co.,* 908 S.W.2d 757, 764 (Mo.App.1995)). It would seem obvious that any risks associated with the withdrawal of an issue are inevitable, and that such risks must be considered by plaintiffs in the planning and presentation of their claims. We know of no authority suggesting that the trial court has an obligation to consider the possibility that the withdrawal of part of a claim for damages may have a negative impact upon plaintiff's credibility. In any event, even if we believed that the trial court erred in withdrawing the claim for future non-economic damages, we *could* grant relief only if we were persuaded that the withdrawal had such a profound effect on Mrs. Still's credibility as to have influenced the jury's verdict on liability. We are not so persuaded. Nevertheless, we will *ex gratia* review the Stills' claim of error.

Dr. Patrick Moriarty, an internist who saw Mrs. Still after the preeclampsia incident, testified that he saw Mrs. Still on September 13, 1994, and she complained of fatigue. Dr. Moriarty believed the fatigue was related to

allergies and prescribed medication for that purpose. On March 22, 1995, Dr. Moriarty saw Mrs. Still, who was still complaining of fatigue and shortness of breath. Dr. Moriarty conducted a plethora of tests and was unable to find a physiological explanation for Mrs. Still's fatigue. Dr. Moriarty saw Mrs. Still again on September 29, 1995, for an annual physical examination. Again, Mrs. Still complained of fatigue. Dr. Moriarty ran additional tests on Mrs. Still and was able to rule out a hormonal imbalance as the cause of her fatigue. On January 3, 1996, Mrs. Still saw Dr. Moriarty for unrelated matters and made no complaint of fatigue or shortness of breath. Finally, Dr. Moriarty saw Mrs. Still on May 22, 1997, for unrelated matters and again, Mrs. Still made no complaint of these matters. There was also some evidence that in 1993, prior to the pregnancy in question, Mrs. Still reported to her physician that she had been experiencing fatigue. The fatigue she experienced at that time was apparently resolved within a month or two.

In deciding to issue the withdrawal instruction, the trial judge stated:

I don't think there is any causal—medical causal relationship that can be submitted to the jury in connection with the claim of fatigue and loss of energy.... I realize that your position is that it is an obvious situation, but my position is there is testimony and evidence that could attribute it to other causes. We're up in the air on that and no doctor has given an opinion. I don't believe yet, that this medical incident and the conduct of the clinic or defendant, the doctor defendant, brought about this condition.

* * *

[Dr. Moriarty] related it more likely to allergies at one point in his testimony. Specifically he said this could be the cause of it, and he did not relate it to the problems that were stemming from the birth of the child and events that occurred after that. He just did not do that. If you had

his testimony to say that it was, then you could probably submit permanent continuing damage, but you don't have it.

* * *

If you can't find [a doctor to say that it's related], you don't get to submit it. It is not an open and obvious situation. It is a complicated medical situation, and it just doesn't fit the cases that you cited, which I've looked at, which allow a submission without medical testimony. You don't have that.

The trial court then allowed the Stills to submit a claim for fatigue and loss of energy through Mrs. Still's recovery period, but did not allow the Stills to submit a claim for continuing damage.

The Stills cite *McPherson v. Bi–State Dev. Agency*, 702 S.W.2d 129 (Mo.App.1985), in support of their argument. The Stills fail to discuss the facts and holding of *McPherson*, and instead cite the opinion for its language. In *McPherson*, the court stated, "... the long continuance of conditions existing at trial is sufficient to authorize an instruction on future pain and suffering." *Id.* at 131–32. "[T]here must be, however, a causal connection between the conditions existing at trial and the negligent occurrence, ... [which] may be established by the sudden onset of the conditions at the time of the accident." *Id.* at 132.

▬▬▬ While the evidence shows that Mrs. Still suffered extreme physical difficulties as a direct result of the severe eclampsia, and that she was in extremis during the HELLPS experience, it is not necessarily clear that fatigue, loss of energy and shortness of breath would continue even after she is otherwise fully recovered. Future damages may not be recovered unless they are reasonably certain to occur in the future. *First National Bank v. Kansas City Southern Ry.*, 865 S.W.2d 719, 738 (Mo.App.1993). This is not a case in which a sudden onset of a specific condition such as kidney failure (which occurred during her preeclampsia) has continued to this date.[3] Nor is this case

---

**3.** The "sudden onset" rule is a rule related to proof of causation allowing the plaintiff to dispense with medical proof of causation of damage in certain instances. *See e.g., Berten v. Pierce,*

818 S.W.2d 685, 686–87 (Mo.App.1991). It involves the matter of proof of the initial injury. *Id.* at 687. *McPherson*, in contrast, involved the

like *McPherson* in which plaintiff, a bus passenger, was thrown on the floor when the bus jerked, suffering contusions to her right thigh and knee plus lumbo-sacral muscle strain. The plaintiff in *McPherson* testified as to her continued pain at trial. Her physician's records showed she had sustained contusions and muscle sprain in the bus incident. The court held that her claim of continuing pain was sufficiently supported in the evidence to warrant submission of future damages. Here, the connection between the illness and the current complaints is far less obvious. Fatigue and low energy are very generalized complaints, and the causes are myriad. They are generally present with severe illnesses, especially those in which the immune system is under attack. However, if fatigue and low energy do .not disappear upon recovery from the illness, we would expect some specific medical reason to be identified. The presence of fatigue and low energy cannot be equated to the continuing presence of a more specific physical injury. Shortness of breath may be more specific than fatigue, but there was no objective finding of any medical cause, and there is nothing in the experience of the average person which. would allow a fact finder to conclude that there exists a causal relationship between the allegedly negligent medical treatment and Mrs. Still's current symptoms.

Under the theory propounded by appellants, any personal injury plaintiff would be entitled to submit a claim for future damages simply on the basis of plaintiff's own testimony that, since the time of tortious incident, plaintiff has continued to suffer from fatigue, low energy, and shortness of breath in spite of having otherwise fully recovered. Medical evidence of causation and diagnosis would be completely unnecessary to create submissibility of the claim for future damages. We cannot believe that the principle applied by the court in *McPherson* can be applied so generally as to include future damages for fatigue and low energy when all of the physi-

cians have concluded that plaintiff has fully recovered.

Mrs. Still had no medical testimony tying her current symptoms to the alleged negligence of these defendants. While we cannot say that her alleged current symptoms are not causally related to the preeclampsia, there was simply no medical evidence to that effect. Dr. Moriarty, in fact, thought at one point that the fatigue was related to allergies. Neither he nor any other physician offered the view that it was related to HELLP Syndrome.[4] Appellants fail to present us with persuasive authority indicating that the trial court was required to allow this submission. Without some sort of medical evidence supporting the submission, we cannot say the trial court erred in declining to submit the claim of permanent damage.

### Conclusion

The judgment of the trial court is affirmed.

ELLIS and HOWARD, JJ., concur.

issue of submissibility of a claim for future damages, which is not precisely the same thing.

4. One physician, who testified that he could find no physiological basis for her complaints, testified he believed that *she* believed she was experiencing difficulties with fatigue and shortness of

breath. He saw it more as a psychological matter than a physical matter, but he could not with reasonable certainty tie any psychological problem to the HELLPS syndrome because he did not have a chance to evaluate her before the incident in question.