Deniece GINGERICH and Andy Gingerich, Appellants,

v.

James E. KLINE, M.D. and St. Joseph OB–GYN, Inc., Respondents.

No. WD 59182.

Missouri Court of Appeals, Western District.

March 12, 2002.

Motion for Rehearing and/or Transfer to Supreme Court Denied April 30, 2002.

Application for Transfer Denied June 25, 2002.

James M. Yeretsky, Overland Park, KS, for appellants.

D. Bruce Keplinger, Overland Park, KS, for respondents.

Before HOWARD, P.J., BRECKENRIDGE and NEWTON, JJ.

PATRICIA BRECKENRIDGE, Judge.

Deniece and Andy Gingerich brought a wrongful death action against James E. Kline, M.D., and Dr. Kline's medical group, St. Joseph OB–GYN, Inc., following the death of the Gingerichs' newborn son, Adrian Gingerich, who had been delivered by Dr. Kline. A jury returned a verdict in favor of Dr. Kline, and the trial court entered a judgment on that verdict. On appeal, the Gingerichs contend that the trial court erred by prohibiting them from introducing statistical evidence of Dr. Kline's personal history of the rate of catastrophic uterine rupture in his patients who have undergone vaginal birth after cesarean section (VBAC) to rebut Dr. Kline's evidence that catastrophic uterine rupture during VBAC was statistically extremely rare. The Gingerichs also argue that, since they were prohibited from mentioning other lawsuits against Dr. Kline for catastrophic uterine rupture, the trial court erred in allowing Dr. Kline's counsel to argue in closing argument that the Gingerichs' case was "the one case that Dr. Kline gets hauled into court on." This court finds that Dr. Kline made the fre-

quency of the occurrence of catastrophic uterine rupture a material issue in the case and, therefore, the trial court abused its discretion in prohibiting the Gingerichs from introducing evidence of the occurrence of a catastrophic uterine rupture in another one of Dr. Kline's patients. The judgment of the trial court is reversed, and the cause is remanded for a new trial.

### Factual and Procedural Background

Adrian was Ms. Gingerich's third child. Ms. Gingerich's two older children, who were ages fifteen and eleven at the time of the trial, had been delivered by cesarean section by Dr. Kline's father. Dr. Kline's father retired from the practice of medicine before 1995, when Ms. Gingerich became pregnant with Adrian. Ms. Gingerich chose Dr. Kline to deliver Adrian, since she had been receiving routine OB–GYN care from Dr. Kline since 1993.

Throughout her pregnancy with Adrian, Ms. Gingerich had regular appointments with Dr. Kline, at intervals of at least every four weeks. At the last of her regular appointments, on October 23, 1995, Dr. Kline scheduled Ms. Gingerich for an induction of labor on October 27th.

On October 27th, Ms. Gingerich and her husband went to Heartland Regional Medical Center for the labor induction. Dr. Kline began the induction that morning; however, Ms. Gingerich's water did not break until the following morning, on October 28th. After Ms. Gingerich's water broke, she was given the contraction-inducing drug Pitocin. By 1:00 P.M., Ms. Gingerich was experiencing excruciating pain, and was given Demerol. Despite taking the Demerol, Ms. Gingerich was still in pain, complaining that the baby was in her ribs. At 1:41 P.M., Ms. Gingerich was almost fully dilated, and the baby's heart rate of 155 to 165 beats per minute was within the normal range. Eleven min-

utes later, however, at 1:52 P.M., the baby's heart rate lowered into the nineties. The two labor nurses attending to Ms. Gingerich attempted to apply an internal scalp electrode to Adrian's head to more closely monitor the fetal heart rate. By 1:56 P.M., the internal scalp electrode was not working, and the nurses noticed bright red blood coming from Ms. Gingerich. The nurses put another internal scalp electrode on Adrian's head, and the electrode indicated that the fetal heart rate had fallen into the sixties. The nurses notified Dr. Kline, who arrived in the room at 2:01 P.M.

When Dr. Kline entered the room, he examined Ms. Gingerich, and ordered an immediate cesarean section. At Dr. Kline's direction, the nurses contacted the anesthesiologist on call, who arrived at 2:15 P.M. and began administering anesthesia to Ms. Gingerich. Adrian was delivered two minutes later.

After Adrian was delivered, it was discovered that, during delivery, he had suffered from hypoxia, or oxygen deprivation, and the hypoxia had caused profound health problems. Because he was unable to breathe on his own, Adrian was intubated. Adrian's prognosis was very poor. The pediatrician who examined Adrian determined that Adrian probably would be mentally retarded with an I.Q. too low to measure, suffer from severe cerebral palsy, have seizure disorders, be unable to feed himself, and would have a limited life expectancy. Mr. and Ms. Gingerich eventually consented to having Adrian extubated, and he died.

Ms. Gingerich was diagnosed as having had a catastrophic uterine rupture. A uterine rupture is "catastrophic" when damage results to the mother or the baby. The rupture occurred along the scar line of the incisions of her prior cesarean sections.

In 1998, the Gingerichs filed a wrongful death lawsuit against Dr. Kline and his medical group, St. Joseph OB–GYN, Inc., for Adrian's death.[1] In their amended petition, the Gingerichs asserted that Dr. Kline and his medical group were negligent:

a. In attempting to perform a VBAC upon Deniece Gingerich when Defendants knew or should have known that Deniece Gingerich's two previous deliveries were by cesarean section.

b. In failing to adequately monitor Deniece Gingerich's pregnancy through full term and delivery.

c. In failing to adhere to accepted medical standards.

d. In failing to perform an ultrasound or other tests upon Deniece Gingerich to determine approximate birth weight and size prior to attempting a VBAC.

e. In attempting a high risk delivery without a qualified physician or anesthesiologist present.

f. In attempting a high risk delivery without a qualified physician or anesthesiologist readily available.

g. In failing to inform Deniece Gingerich of the risks associated with a VBAC.

h. In failing to obtain Deniece Gingerich's informed consent to a VBAC.

i. In failing to interpret, monitor, assess and document Deniece Gingerich's fetus and contraction patterns.

j. In failing to recognize an abnormal or non-reassuring fetal heart rate pattern.

k. In failing to appropriately respond to an abnormal or non-reassuring fetal heart rate pattern.

l. In failing to monitor the administration of labor and contraction enhancing drugs in a high risk pregnancy.

m. In failing to timely respond after Deniece Gingerich's uterus ruptured.

n. In failing to implement and adhere to adequate protocols and guidelines for counseling, managing and treating patients who undergo a VBAC.

o. In failing to use the degree of skill and learning ordinarily used under the same or similar circumstances by other OB–GYNs.

Based on the asserted negligence of Dr. Kline and St. Joseph OB–GYN, Inc., the Gingerichs sought damages for "the reasonable value of the services, consortium, companionship, comfort, instruction, guidance, counsel, training and support which ... Adrian Gingerich would have provided [the Gingerichs] throughout his lifetime and for the aggravating circumstances attending the delivery and death of their newborn son." The Gingerichs also sought punitive damages.

A jury trial was held in August 2000. The jury returned a verdict for Dr. Kline, and the court entered a judgment on this verdict. The trial court denied the Gingerichs' motion for new trial. The Gingerichs filed this appeal.

### Standard of Review

■■■ The trial court has "considerable discretion" in determining whether to admit or exclude evidence. *Deveney v. Smith*, 812 S.W.2d 810, 812 (Mo.App.1991).

---

**1.** The Gingerichs also sued Heartland Regional Medical Center; Heartland Health Systems, Inc.; the two nurses who were present during Ms. Gingerich's labor and delivery; the anesthesiologist; and the anesthesiologist's medical group. The Gingerichs dismissed their claims against the anesthesiologist and the anesthesiologist's medical group without prejudice on December 13, 1999. In July 2000, the trial court approved the settlement of the Gingerichs' claims against the nurses and both Heartland defendants.

Appellate review of the exclusion of evidence is limited to a determination of whether the trial court abused that discretion, and not whether the evidence was, in fact, admissible. *Still v. Ahnemann,* 984 S.W.2d 568, 572 (Mo.App.1999). "We will find no abuse of discretion in excluding evidence unless the materiality and probative value of the evidence were sufficiently clear, and the risk of confusion and prejudice so minimal, that we could say that it was an abuse of discretion to exclude it." *Id.*

## Abuse of Discretion to Exclude Evidence

◼◼◼◼ In their first point, the Gingerichs argue that the trial court abused its discretion in excluding statistical evidence of Dr. Kline's personal history of the rate of catastrophic uterine rupture in his patients who have undergone a VBAC. In 1996, a year after Ms. Gingerich suffered the catastrophic uterine rupture during Adrian's delivery, another of Dr. Kline's patients suffered a catastrophic uterine rupture while attempting a VBAC. The baby in that case lived but suffered injuries. The parents of the baby sued Dr. Kline for malpractice.[2] The 1996 case was settled before the start of the Gingerichs' trial.

To prevent the admission of evidence regarding the 1996 case during the Gingerichs' trial, Dr. Kline filed a motion *in limine* asking the court to prohibit the Gingerichs from, *inter alia,* "offering into evidence, referring to, or otherwise alluding to the facts indicating that [Dr. Kline] has been involved in any litigation or had any malpractice claims against him outside of the instant case." Dr. Kline also asked that the court prohibit the Gingerichs from offering evidence "indicating or suggesting

that Dr. Kline has had other patients who have had complications during delivery." The court granted Dr. Kline's motion *in limine.*

At trial, one of the witnesses the Gingerichs called was Pamela Sue Smith, a staff nurse in the obstetrical department at Heartland Regional Medical Center. As part of Ms. Smith's duties at Heartland, she compiled OB statistics for Dr. Kline's medical group, St. Joseph OB–GYN, Inc. Ms. Smith kept monthly records of, among other information, how many deliveries the group had, whether the deliveries were vaginal or cesarean section, the babies' health at birth, and any complications during the deliveries, including uterine ruptures. At the end of the year, Ms. Smith converted her monthly statistics into yearly statistics for the group, and compared the statistics for that year to the statistics for the two previous years.

During Ms. Smith's testimony, the Gingerichs offered into evidence as exhibits two of Ms. Smith's year-end statistical compilations. One of the exhibits, Exhibit 40, was the total OB statistics for Dr. Kline's group for 1995, compared to the statistics for 1993 and 1994. The other exhibit, Exhibit 41, was the total OB statistics for Dr. Kline's group for 1996, compared to the statistics for 1994 and 1995. Dr. Kline objected on the bases that the statistics were not relevant, and that Exhibit 41, since it contained the statistic of the 1996 catastrophic uterine rupture, was prejudicial and violated the court's earlier motion *in limine.* The Gingerichs argued that the statistics showing the 1996 catastrophic uterine rupture should be admitted because during Dr. Kline's opening statement, his counsel apparently stated that the risk of a catastrophic uterine rup-

---

**2.** In addition to suing Dr. Kline, the parents of that baby also sued the doctor who was present for the actual delivery and Heartland Regional Medical Center.

ture is one in 5000.[3] Thus, the Gingerichs argued that Dr. Kline "opened the door" to the admission of evidence showing that the risk of catastrophic uterine rupture among his patients was higher than one in 5000.

The trial court disagreed with the Gingerichs' argument that Dr. Kline "opened the door" to the admission of evidence concerning the 1996 catastrophic uterine rupture. The court deemed evidence of the 1996 catastrophic uterine rupture prejudicial and collateral, and re-stated that its earlier ruling on the motion *in limine* stood. Nevertheless, the court admitted Exhibits 40 and 41 into evidence after finding that the exhibits were merely raw numbers for the medical group that did not mention the names of any particular patients or their specific doctors.

As part of his defense, Dr. Kline called Dr. James Thorp, a maternal-fetal medicine specialist, to testify as an expert. Dr. Thorp testified that no delivery option is "risk free," and that there are risks associated with a VBAC. According to Dr. Thorp, the risk of a uterine rupture during a VBAC is five per 1000 births; however, not all of these are "catastrophic" uterine ruptures, or uterine ruptures that result in damage to the baby. Dr. Thorp testified that uterine ruptures are rarely catastrophic to the mother and the baby and, in fact, "the vast majority of them are not catastrophic." According to Dr. Thorp, the risk of a catastrophic uterine rupture resulting in damage to the baby is one in 5000.

Dr. Kline also testified in his defense. Dr. Kline testified that the risk of serious injury or death to the infant during a VBAC is small, and he acknowledged that the risk of a catastrophic uterine rupture

is one in 5000. After this testimony, the Gingerichs' counsel attempted to question Dr. Kline about his personal history of VBACs using Exhibit 41, the 1996 OB statistics for Dr. Kline and his medical group. When Dr. Kline objected, the court changed its prior ruling and ruled that Exhibit 41 was, in fact, inadmissible because events that occurred after Adrian's birth were irrelevant.

Dr. Kline's counsel referred to the infrequency of catastrophic uterine rupture again in his closing argument. At one point, counsel stated, "And if we use hindsight, we know that the one in 5,000 occurrence that happened in this case, that doesn't mean anybody was negligent." On another occasion, in discussing the burden of proof, Dr. Kline's counsel argued, "So I'm basically going to talk about the burden of proof that they have to convince you that it's more probably true than not true that Dr. Kline committed malpractice because he just didn't. Only in hindsight do we know that the one in 5,000 chance tragically happened." Dr. Kline's counsel went on to discuss the relative risks between a cesarean section and a VBAC:

> Now, as all the doctors told you, we don't know for sure if you had a C-section if that would have been all right. It probably would have been. There's a good chance it would have been. But there was [a] 4,999 out of 5,000 chance that the VBAC would have produced no serious problems. Just, unfortunately, in this one case, it did. And, of course, it's the one case that Dr. Kline gets hauled into court on.

On appeal, the Gingerichs contend that the evidence of the 1996 catastrophic uter-

---

**3.** The opening statements were not transcribed. From the parties' arguments at the bench regarding Dr. Kline's objection to the admission of Exhibits 40 and 41, it appears that Dr. Kline's counsel stated in opening statement that the risk of a catastrophic uterine rupture is one in 5000.

ine rupture was essential to rebut Dr. Kline's own evidence and defense that catastrophic uterine rupture during a VBAC is statistically extremely rare, and the trial court's excluding the evidence deprived them of a fair trial. Dr. Kline argues that the trial court did not abuse its discretion because such evidence was irrelevant and would have improperly introduced into evidence other lawsuits involving Dr. Kline.

A plaintiff is not permitted to introduce evidence of "allegedly similar instances of prior negligence of the defendant in order to show that the defendant was negligent or reckless on this occasion, also." *State ex rel. Malan v. Huesemann,* 942 S.W.2d 424, 430 (Mo.App.1997). Nevertheless, if evidence of similar instances is admissible on any other issue, "it is not to be excluded because it would be inadmissible on another issue in the case." *Pettet v. Bieterman,* 718 S.W.2d 188, 191 (Mo.App. 1986). For example, "[w]hen a material part of one party's defense is to show the infrequency of an occurrence, or that an occurrence is very rare, an opponent may present relevant evidence to refute the inferences raised by that defense." *Gerow v. Mitch Crawford Holiday Motors,* 987 S.W.2d 359, 365 (Mo.App.1999).

This court applied this principle to a medical malpractice case in *Deveney,* 812 S.W.2d at 811–12. In *Deveney,* the plaintiff sued his oral surgeon, alleging that the surgeon negligently removed the plaintiff's lower wisdom teeth, resulting in permanent bilateral nerve damage. *Id.* at 811. The trial court refused to allow the plaintiffs to admit the medical records of two of the surgeon's other patients who also allegedly suffered the same kind of injury after the surgeon extracted their lower wisdom teeth. *Id.* The other two injuries occurred after the plaintiff's injury. *Id.* at 812.

This court reversed, after finding that the evidence was relevant to refute the surgeon's defense. *Id.* at 813. Specifically, this court noted that "[a] material part of [the surgeon]'s defense was to show that this type of injury does occur on rare occasion when a patient has an unknown anomalous nerve pattern." *Id.* The surgeon asserted that it was the plaintiff's anomalous nerve pattern, and not the surgeon's negligence, that caused the plaintiff's injury. *Id.*

Additionally, this court noted that another part of the surgeon's defense was the rarity of occurrence of permanent bilateral lingual nerve damage. *Id.* In fact, the surgeon's expert witness testified that, although the plaintiff's injury "was an accepted risk in the extraction of wisdom teeth," it was "very, very unusual." *Id.* at 812. Thus, this court found that the surgeon "made frequency of occurrence a material issue." *Id.* at 813. As a result, this court held that "[i]t was reversible error for the trial court to exclude evidence of other occurrences of permanent bilateral lingual nerve damage to patients of [the surgeon] within the same relative time frame as [the plaintiff]'s." *Id.*

In reaching this conclusion, this court relied on the case of *Pettet,* 718 S.W.2d at 191. The plaintiff in *Pettet* sued a surgeon after the surgeon perforated her bladder during a laparoscopy. *Id.* At trial, the surgeon testified in his defense that the possibility of hitting one of the visceral organs was " 'known to happen in as many as one, two or three in a thousand women, and if I do one thousand women this could happen in three out of the thousand.' " *Id.* On cross-examination, the trial court permitted the plaintiff's attorney to ask the surgeon about his having perforated the bladder of another of his patients in addition to the plaintiff. *Id.* The appellate court affirmed the admission of evidence of

the other injury, finding that, where the "defendant has opened up the subject, he will not be heard to complain of the testimony elicited by plaintiffs to refute the inferences raised by his evidence." *Id.*

In this case, Dr. Kline offered evidence of the statistical rarity of catastrophic uterine rupture, the injury suffered by Ms. Gingerich. Dr. Kline's counsel mentioned in his opening statement that the risk of catastrophic uterine rupture during a VBAC is only one in 5000. Dr. Kline's expert, Dr. Thorp, testified that the risk of catastrophic uterine rupture during a VBAC is rare, and the "vast majority" of uterine ruptures during a VBAC are not catastrophic. Dr. Thorp and Dr. Kline both testified that the risk of a catastrophic uterine rupture during a VBAC is only one in 5000. Dr. Kline's counsel utilized this "one in 5000" figure in his closing argument to argue, repeatedly, that Dr. Kline was not negligent in treating Ms. Gingerich because catastrophic uterine rupture was such a statistically rare event.

Like the defendants in *Deveney*[4] and *Pettet,* Dr. Kline made the frequency of occurrence of the injury a material issue by arguing the statistical rarity of catastrophic uterine rupture during a VBAC throughout his case—in his opening statement, Dr. Thorp's testimony, Dr. Kline's own testimony and, finally, in his closing argument. The trial court's ruling excluding the 1996 OB statistics occurred after Dr. Kline made the frequency of occurrence a material issue. Thus, the trial court erred in ruling that the 1996 OB statistics, which included the 1996 catastrophic uterine rupture in another of Dr. Kline's patients, were inadmissible to refute Dr. Kline's evidence. *Deveney,* 812 S.W.2d at 813. That the 1996 catastrophic uterine rupture occurred after Ms. Gingerich's catastrophic is irrelevant, because the purpose of its admission was to refute Dr. Kline's defense as to the statistical rarity of catastrophic uterine rupture during a VBAC. *See id.* at 812–13 (allowing evidence of injuries that occurred after the plaintiff's injury for purpose of refuting frequency of occurrence evidence).

Because Dr. Kline argued the statistical rarity of catastrophic uterine rupture during a VBAC throughout the case as part of his defense, the probative value of the occurrence of a catastrophic uterine rupture in another of Dr. Kline's patients within the same relative time frame as Ms. Gingerich's catastrophic uterine rupture outweighed its prejudicial effect. Therefore, this court finds that it was reversible error for the trial court to exclude evidence of the occurrence of the 1996 catastrophic uterine rupture in another of Dr. Kline's patients. In making this ruling, this court notes that it is only the *occurrence* of the 1996 catastrophic uterine rupture, and not the ensuing lawsuit or the settlement of that lawsuit, that is admissible. *See Malan,* 942 S.W.2d at 430. The Gingerichs' first point is granted.

---

4.  Dr. Kline contends that this case is different from *Deveney* because the defendant in *Deveney* used the statistical rarity of the injury to argue that the injury had to have been caused by the plaintiff's anomalous nerve pattern. *Deveney,* 812 S.W.2d at 813. While that was one of the defenses asserted in *Deveney,* and, thus, one of the reasons this court ruled evidence of similar injuries in other of the surgeon's patients should have been admitted, another defense in *Deveney* was simply the frequency of the occurrence of the injury. *Id.* at 813. This court addressed the two defenses separately, and ruled that the evidence of other injuries within the same relative time frame was relevant to refute both defenses. *Id.* The rule in *Deveney* regarding the admission of evidence of other injuries within the same relative time frame to refute evidence of frequency of occurrence of the injury, therefore, applies to this case.

The Gingerichs' second point on appeal is that the trial court erred in allowing defense counsel to argue in closing argument that "of course it's the one case that Dr. Kline gets hauled into court on," in light of the court's ruling on the motion *in limine* prohibiting the Gingerichs from mentioning any other lawsuits involving Dr. Kline. Because this court is reversing and remanding for a new trial, we do not need to address this point.

The judgment of the trial court is reversed, and the cause is remanded for a new trial.

All concur.