Glen L. **HANCOCK**, Appellant,

v.

**William and Ruth SHOOK, d/b/a Barnes Feed Store, Respondents.**

**No. SC 84509.**

Supreme Court of Missouri, En Banc.

March 18, 2003.

Rehearing Denied April 22, 2003.

---

Mr. Timothy E. Gammon, Springfield, for Appellant.

JoAnne S. Jackson, Michele Craycroft, John Housely, Springfield, for Respondents.

PRICE, J.

## I.

Glen Hancock appeals a verdict in his favor of $12,500 against William and Ruth Shook, doing business as Barnes Feed Store. Mr. Hancock's dairy herd ingested feed purchased from the Shooks that was contaminated with a toxic mold. Mr. Hancock sought $600,000 in damages resulting from losses to his herd and decreased milk production. The judgment is affirmed.

## II.

### A. Background Facts

Glen Hancock is a dairy farmer and was a regular customer of Bill and Ruth Shook, owners of Barnes Feed Store. In March 1992, Mr. Hancock purchased feed from the Shooks and fed it to his milking herd. Mr. Shook admitted that this feed was contaminated with aflatoxin.[1] Four days of milk production[2] totaling nearly 36,000 pounds was dumped because of unhealthy levels of aflatoxin in the milk. Mr. Hancock explained that not every cow reacted the same way to the contaminated feed, but that much of his herd reacted poorly. There were three aborted (miscarried) calves immediately after feeding the contaminated feed and Mr. Hancock culled[3] 126 cows because of aflatoxin-related problems. Finally, Mr. Hancock claimed that overall milk production decreased for a number of years because of the large amount of culls and continuing health problems relating to the ingestion of aflatoxin.

### B. Procedural History

**Pre–Trial**

Prior to trial, the court made a number of rulings, including a decision that Mr. Hancock could not testify that he knew the problems in his herd were caused by aflatoxin-contaminated feed, even though he had traveled to look at another herd with a known aflatoxin problem.

**The Trial**

Mr. Shook was called by Mr. Hancock and testified that he knew of other incidents of aflatoxin-contaminated feed at local mills. In fact, the Shooks had purchased an aflatoxin test kit in February 1992 at least partly due to knowledge of other incidents of aflatoxin in the area. However, the Shooks had not tested any feed when the contaminated feed was sold to Mr. Hancock. Mr. Shook testified that he was aware that some local mills were testing for aflatoxin in March 1992, but he said, "many were not."

There was some dispute during the testimony of Dr. Mozier, Mr. Hancock's veterinarian, as to whether he could show that the three abortions occurred after the aflatoxin-contaminated feed was fed to the Hancock herd. Dr. Mozier produced a series of "tickets" from visits to Mr. Hancock's farm in March 1992. The three abortions were represented on ticket number 14158, which was partially dated "03/___/92." Ticket number 14134 was dated

---

1. Aflatoxin is a highly potent natural carcinogen produced by certain molds that grow on any starch-based feed when exposed to certain environmental conditions.

2. March 12, 1992 though March 15, 1992.

3. To "cull" a cow means to sell it for slaughter.

"03/13/92." When asked what this would suggest, Dr. Mozier testified that he assumed the three abortions occurred after March 13, 1992, because the ticket number for the incomplete date was higher than the March 13 ticket. However, when cross-examined, Dr. Mozier testified that the ticket numbers would not necessarily be in sequence and, therefore, he could not be certain that the abortions occurred after the aflatoxin incident.

The trial court allowed juror questions as a regular aspect of the trial procedure. The court and the attorneys reviewed the submitted jury questions at sidebar and discussed the appropriateness of each question. The attorneys were allowed to object if they felt a question should not be asked. The court sometimes refused to ask a question and sometimes altered the question from that submitted in order to make the question more understandable.

Following Dr. Mozier's testimony, a juror submitted this question: "[I]s there any way to figure out the doses—the date of the farm visit with the three aborted cows?"

THE COURT: I assume you two would have figured this out by now if there was some other way to find out the date with this witness.

MR. GAMMON [Mr. Hancock's attorney]: Well, you can ask him. He might -

THE COURT: I'll ask him.

When proceedings returned to open court, the following transpired:

THE COURT: Doctor, I have a couple of questions from the jury.

Do you know of any other way to figure out the date of the farm visit with the three aborted cows than what we've already asked you about here today?

THE WITNESS: I can certainly try to. I may have a way by finding the blood samples in that particular day, and I might be able to find that record. I can do that this evening at the office. I might be able to find out that way.

Dr. Mozier subsequently sought out and discovered other records that confirmed that the abortions occurred after the aflatoxin incident. When Mr. Hancock sought to recall Dr. Mozier to testify to this new information, the following discussion ensued:

MR. GAMMON: ... because Dr. Mozier answered the juror's question by saying yes, I think there may be additional records and I can look at them, Dr. Mozier did that subsequently .... He's not available this morning. I believe we need to go ahead and close our case. I've offered two alternatives.

One, that we would stipulate to the information he gave me which is that there is a record, a written document, that shows that it was collected on the farm on March the 14th, which would have been the day of that visit.

He did testify he remembered the day very specifically, and the visit, but he did not remember what day it was. But this record shows that that date was March the 14th.

I've offered to bring him tomorrow to testify to that fact. I also have represented that I expect him to be here tomorrow, for rebuttal. And my position is that her experts have seen these same tickets and testified that it appears to them that this was after March the 13th. And I'm going to ask them about that and thus it will be a proper question for rebuttal in any event.

THE COURT: ... the issue really comes down to not whether the juror asked a question, because it wasn't like something that you hadn't asked and Ms. Jackson hadn't crossed him on. The issue really is would I allow you in

any trial to reopen—to hold open your evidence and bring back in evidence that he later went out and found because of cross-examination.

MS. JACKSON: And there's another thing ... these records were all requested in discovery. We requested all of the veterinary records, including lab reports. And that wasn't produced. We've never seen that record. I didn't have any experts testify that this call was made after the incident. That was the question they were asked by Mr. Gammon that assumed this. But we've never seen that record, it's never been produced. And it's a little late now to pull it out [as] some kind of smoking gun just because I impeached their expert and they're trying to rehabilitate him and rebut their own testimony.

THE COURT: ... I probably won't let you call this witness. There was no agreement that he could go out and look for this ticket—

. . . .

THE COURT: You did not disclose it in the request for production of documents first.

. MR. GAMMON: We didn't know he had it.

THE COURT: He didn't look. You were asked to look for the documents that you have to establish your claims

. . . .

MS. JACKSON: Judge, we got the vet records from two sources. We got them from the Plaintiff and we got a separate set from Dr. Mozier directly. It wasn't in either one of them. Nobody produced them. If it was a record that existed, it should have been produced if they were going to rely on it.

MR. GAMMON: We didn't think it was an issue until—

MS. JACKSON: You didn't think it was an issue until he was impeached on the witness stand. And it's not proper for you to rebut your own testimony at this point. You should have looked for it. That's what the burden of proof is about.

THE COURT: ...you had him on the stand. You went through his vet tickets.... That's the way it was left for the jury. It's for them to decide.... You're not going to be able to bring him back just like I wouldn't let you bring any other witness back after they've been impeached and say oh, I went out and found some more stuff to show you that I'm right. That's not the way trials are done.

Dr. Mozier was recalled to testify during Hancock's rebuttal case, but was not asked about the date of the three abortions. Jurors were again allowed to submit questions. At sidebar, the court and attorneys discussed the questions:

THE COURT: Court Exhibit 28, did Dr. Mozier look up the date for the three aborted calves on Mr. Hancock's farm? He said he could look for the date on lab results. Did you find the blood tests on the three cows that had the abortions? If so, what were the dates that the tests were given?

MS. JACKSON: I object on the basis that the discovery wasn't provided.

THE COURT: I'll sustain the objection.

. . . .

THE COURT: .... He didn't have the records. You didn't produce the records. How can you be now saying this was unfair when you didn't produce the records in direct examination? He didn't have them.

The court did not submit the jury questions to Dr. Mozier.

At the close of Mr. Hancock's case, the Shooks moved for directed verdict. The Shooks first alleged that Mr. Hancock failed to prove his negligence claim because he did not show that it was the industry standard to test for aflatoxin in 1992. The Shooks also argued that Mr. Hancock could not submit his claim for negligence *per se*, because he did not submit any testimony regarding the Missouri Commercial Feed Law.[4] In addition, the Shooks argued that "[c]ase law provides that there is no private cause of action implied into any penal statute, which is what the Missouri Feed Law is, absent an expressed provision or a clarification of legislative intent to do so." The court sustained the defendants' motion on the negligence *per se* count, but overruled the motion as to the negligence claim.

Later in their case, the Shooks sought to play portions of the videotaped deposition of George Parsons, a department of natural resources employee. Mr. Hancock objected to the playing of the videotape without contemporaneous reading of his own counter-designations. The court responded:

> THE COURT: Whatever your understanding was, Mr. Gammon, the problem is we're sitting here waiting for the jury to come in and watch it. I can't fix that right now. Now if you'd said something two days ago, maybe I could have asked her—
>
> . . . .
>
> THE COURT: Well, I don't know any way to fix it other than let Ms. Jackson play her video and then let you read the parts that you want to read."

Mr. Hancock also objected to references within the deposition that referred to a settlement letter he submitted to Miller's Mutual Insurance. In the letter Mr. Han-cock claimed damage for only 11 cows, not the higher number of 126 he was claiming at trial. Mr. Hancock argued that the reference was improper evidence because it referred to settlement negotiations. The court ruled that the evidence was not improper because "it's a statement by him that he had 11 cows he had to cull, just like any other statement he would make."

In the alternative, Mr. Hancock argued that he should be allowed to present the entire document under the doctrine of completeness. The Shooks argued that the references never mentioned insurance or settlement and that they should be admitted as an admission. The court ruled that Hancock was "not entitled to bring the whole document in . . . because it's not like the completeness rule in other areas where you bring in part of a document."

> THE COURT: . . . unless it's not about settlement, unless there's some statement by Bill Shook in there that says well, it couldn't have been 11, you had to have at least a hundred cows affected because the aflatoxin was 3,000 times its regular limit. That would be something I would admit in.
>
> . . . you haven't told me anything about the rest of the letter that leads me to believe it's about the facts of this case versus settlement."

The trial court determined that the rule of completeness did not require the submission of the entire letter here and that Mr. Hancock could explain the different numbers (11 versus 126) in his rebuttal testimony.

After hearing all of the evidence, the jury returned a verdict for Mr. Hancock in the amount of $12,500.

4. Section 266.180, RSMo 2000.

## Post–Trial

After trial, George Parsons filed an affidavit in which he admitted that portions of his videotaped testimony were inaccurate. The affidavit stated in pertinent part:

2. Portions of my testimony...were inaccurate due to the following:

a. I was scheduled for open heart surgery and I did not have a chance to review the file.

b. I did not know until Friday 4/21/00 my deposition was going to be taken.

c. I was provided documents at my deposition by Ms. Craycroft, attorney for the Defendant [the Shooks], but only selected portions of the records for the Hancock dairy.

d. Because my deposition was taken by Ms. Craycroft in the eleventh hour, I did not have the opportunity to review the transcripts [sic] accuracy. To this date I have not seen the transcript.

3. Having reviewed all the records, I now believe:

a. The Bolivar Ready Mix suit was filed in February 1998, and that I was last at the Hancock dairy on April 25, 1997.

b. At the time I was last at the dairy there were free standing walls but the push off ramps to the pits were not completed.

The trial court overruled Mr. Hancock's motion for new trial based on this affidavit.

### III.

#### A.

In his first point on appeal, Mr. Hancock argues that the trial court erred when it refused to ask two juror questions submitted following Dr. Mozier's rebuttal testimony, because the court had previously asked a similar juror question that created an expectancy in the jury that the question would be answered. Mr. Hancock contends that he was prejudiced when this expectancy went unfulfilled. The Shooks respond that the question was improper because the basis for the answer was records that were not disclosed during discovery.

At trial, Dr. Mozier testified regarding three aborted calves on Mr. Hancock's farm. Because of a bookkeeping error, Dr. Mozier could not absolutely determine on what date these abortions occurred. Following Dr. Mozier's testimony, a juror submitted a question inquiring whether or not there was any other way to determine the date of the abortions. After a brief discussion between the court and the attorneys, Dr. Mozier was asked, "Do you know of any other way to figure out the date of the farm visit with the three aborted cows than what we've already asked you about here today?" Dr. Mozier answered, "I can certainly try to. I may have a way by finding the blood samples in that particular day .... I can do that this evening at the office. I might be able to find out that way." Dr. Mozier did in fact search other records in his office and found additional documents that allowed him to determine that the three abortions occurred after the aflatoxin incident. Unfortunately, these additional documents had not been produced to the Shooks during discovery. Also, Dr. Mozier was unavailable to testify the next day. Mr. Hancock sought permission to hold open his case for an additional day or to be allowed to re-open his case to call Dr. Mozier. The court refused to permit Mr. Hancock to hold open his case and the Shooks further objected to Dr. Mozier's testimony citing discovery abuses.

During discovery, Mr. and Mrs. Shook made a request for "[a]ll reports, including but not limited to laboratory reports, re-

ports of examination, analysis, testing, or treatment, conducted by any person or entity as a result of the incident alleged in your Petition." The Shooks also requested "[a]ll veterinary records that have not been produced," and "all records of any testing of any nature whatsoever done on your dairy farm from 1991 to 1996." Mr. Hancock did not produce the laboratory blood tests done by Dr. Mozier on the date of the "three-abortion visit."[5] Mr. Hancock defended that he was not in possession of the lab tests, nor did he know of their existence. Mr. Hancock defended further, saying he executed and delivered an authorization allowing the Shooks to obtain Dr. Mozier's records in response to the Shook's second request for production.

The trial court determined that the issue was not that a juror asked the question "because it wasn't like something you hadn't asked and Ms. Jackson hadn't crossed him on. The issue really is would I allow you in any trial to reopen—to hold open your evidence and bring back in evidence that he later went out and found because of cross-examination." The court further explained that he could not call Dr. Mozier because of discovery violations. The court said, "You did not disclose it in the request for production of documents first." The court admonished Mr. Hancock saying, "You were asked to look for the documents that you have to establish your claims .... Now you should have produced, and you should have known that might be an issue." The court concluded:

> [Y]ou had him on the stand. You went through his vet tickets.... That's the way it was left for the jury. It's for them to decide.... You're not going to be able to bring him back because I wouldn't let you bring any other witness

back after they've been impeached.... That's not the way trials are done.

### 1.

Trial courts retain broad discretion over discovery and the admissibility of evidence and appellate courts will not interfere with those decisions unless there is a clear showing of abuse of discretion. *State v. Winfield,* 5 S.W.3d 505, 515 (Mo. banc 1999); *Wilkerson v. Prelutsky,* 943 S.W.2d 643, 647 (Mo. banc 1993). A trial court also has the discretion to permit or deny jurors the privilege of asking questions. *Callahan v. Cardinal Glennon Hosp.,* 863 S.W.2d 852, 867 (Mo. banc 1993). An abuse of discretion occurs when a trial court's ruling is clearly against the logic of the circumstances then before the court and is so unreasonable and arbitrary that it shocks the sense of justice and indicates a lack of careful, deliberate consideration. *Nelson v. Waxman,* 9 S.W.3d 601, 604 (Mo. banc 2000). If reasonable persons can differ as to the propriety of the trial court's action, then it cannot be said that the trial court abused its discretion. *Wilkerson,* 943 S.W.2d at 647.

The fact that the question asked of Dr. Mozier is a question submitted by a juror is immaterial to the decision of the issue. "[I]t is proper for a juror to ask a question through the trial judge in order to clarify some point in the juror's mind. It has been said that among the trial court's inherent powers in the administration of justice is his power to interrogate witnesses." *Sparks v. Daniels,* 343 S.W.2d 661, 667 (Mo.App.1961). The trial judge is in the best position to determine whether or not a question (including a juror's ques-

---

**5.** Copies of the discovery documents were not included in the legal file. This information comes from Mr. Hancock's brief.

tion) is proper to submit to a witness. *Callahan,* 863 S.W.2d at 867.

In fact, the question asked here was particularly pertinent. The accuracy of the date of the three aborted calves bears directly upon causation. Presumably, Mr. Hancock's counsel did not pursue this inquiry because he did not know these records existed and mistakenly believed he could do no better in his proof. The Shooks, on the other hand, had no reason to ask any further questions that might help Mr. Hancock establish causation. It was the jury, with no strategy other than discovering the truth, that initiated the obvious question, "Doctor ... do you know of any other way to figure out the date of the farm visit with the three aborted cows than what we have already asked you about here today?"

Although there was no objection to this question by either party, the doctor's answer foreshadowed the problem that was to develop. The doctor found the answer in documents that had been requested but not produced.

Although the discovery documents were not included in the legal file, Mr. Hancock's brief makes the following recitation and argument:

> Defendants' First Request for Production Item 11, sought "[a]ll reports, including but not limited to laboratory reports, reports of examination, analysis, testing, or treatment, conducted by any person or entity as a result of the incident alleged in your Petition." Similar requests were made in Defendants' Fifth Request for Production, "[a]ll veterinary records that have not been produced," and "all records of any testing of any nature whatsoever done on your

dairy farm from 1991 to 1996." But again plaintiff had no such reports and knew of no such reports other than the tests Barnes had conducted on the feed and the positive milk tests from Mid–Am. Plaintiff did not know of the existence of any other reports and had no such reports. Plaintiff executed and delivered an authorization which allowed defendants to obtain Dr. Mozier's records, at the time of Defendants' Second Request for Production.

Second, those records were not Plaintiff's records, but those of a third-party, Dr. Mozier, which plaintiff did not have or have access to. Lab reports were kept separately and not with the individual customer farmer's file. They were not bills or invoices sent to the customers to pay, but rather bills which Dr. Mozier paid directly. Plaintiff issued an authorization to allow defendants to seek records from every vet plaintiff had used, including Dr. Mozier.

■ Plaintiff misses the thrust of Rule 58.01(a).[6] The rule is not limited to documents only in the possession of a party. Instead, Rule 58.01(a) provides that "[a]ny party may serve on another party a request (1) to produce ... any designated documents ... which are in the possession, custody *or control* of the party upon whom the request is served ...." (emphasis added). Our Rule 58.01(a) is identical to Federal Rule of Civil Procedure 34(a). The "[b]asic test of the rule is 'control' rather than custody or possession." WILLIAM W. BARRON & HON. ALEXANDER HOLTZOFF, FEDERAL PRACTICE AND PROCEDURE § 795 (Charles Alan Wright rev.1960); *Bifferato v. States Marine Corp.,* 11 F.R.D. 44, 46 (D.N.Y.1951) ("The true test is control and not posses-

---

**6.** The Court does not address whether these documents were also discoverable pursuant to Rule 56.01(b)(4).

sion."). "'Control' does not require that the party have legal ownership or actual physical possession of the documents at issue; rather, documents are considered to be under a party's control when that party has the right, authority, or practical ability, to obtain the documents from a non-party to the action." *Prokosch v. Catalina Lighting, Inc.,* 193 F.R.D. 633, 636–37 (D.Minn.2000). *See also United States v. Skeddle,* 176 F.R.D. 258, 261 n. 5 (N.D.Ohio 1997) (A court may require a party to produce documents held by a non-party if the party has the "practical ability to obtain the documents ... irrespective of his legal entitlement to the documents."); *Scott v. Arex,* 124 F.R.D. 39, 41 (D.Conn. 1989) ("The word 'control' is to be broadly construed...."). In *State v. Whitfield,* 837 S.W.2d 503, 507 (Mo. banc 1992), Missouri applied the "control" test in relation to discovery in a murder case holding that it was error for the trial court to allow into evidence a coat with bullet holes that had not been disclosed to the defense.

█ The record indicates no objection to these requests for production. In fact, both Mr. Hancock and Dr. Mozier responded to the Shooks' requests and each produced a number of documents. Having acquiesced to the requests for production, both Mr. Hancock and Dr. Mozier were under a duty to respond completely and truthfully after having made a reasonable inquiry. *See* 149 A.L.R. FED. 599, 601–02 (1998). In this context, the record establishes that Mr. Hancock had practical control over his treating veterinarian and designated expert witness, Dr. Mozier, at least to the extent of production of documents maintained by Dr. Mozier that related to Mr. Hancock's dairy herd. Although Dr. Mozier was in direct possession of the lab reports, Mr. Hancock had the "practical ability to obtain" the lab reports from his retained expert for the purposes

of Rule 58.01(a). If Mr. Hancock had an objection to the manner in which the Shooks used this rule, it was incumbent upon him to raise it at that time and to preserve it here in the record for review. He did neither.

Mr. Hancock further argues that any failure to produce these documents was the result of Dr. Mozier's inexperience with the litigation process. This may well be true. The documents at issue were helpful, not harmful to Mr. Hancock. Nonetheless, "[t]he expert witness is wholly in the control of the party who retained him or her." *State ex rel. Tracy v. Dandurand,* 30 S.W.3d 831, 835 (Mo. banc 2000); *State ex rel. Am. Econ. Ins. Co. v. Crawford,* 75 S.W.3d 244, 246 (Mo. banc 2002); *Ortiz–Lopez v. Sociedad Espanola de Auxilio Mutuo Y Beneficiencia de Puerto Rico,* 248 F.3d 29 (1st Cir.2001) ("The selection or retention of an expert witness is within the control of the party employing the expert. That is, to the extent that there is a disadvantage created by the expert's failure to disclose, it must be born by the party retaining the expert witness." *Id.* at 34).

█ It was not unreasonable for the trial court to conclude that the Shooks had relied upon the documents produced as the extent of what Mr. Hancock would introduce at trial. It also was not unreasonable for the trial court to conclude that to permit these additional documents to be admitted and discussed at trial, without having been previously produced, would have been prejudicial to the Shooks. Certainly, the trial court could have allowed Dr. Mozier to give his additional testimony concerning the documents after allowing the Shooks the opportunity to depose him during a recess of the trial. However, more drastic remedies also existed, such as striking the witness's testimony or a party's pleadings. *See Chrysler Corp. v. Car-*

*ey,* 186 F.3d 1016 (8th Cir.1999).[7] As it was, the trial court simply refused to allow Dr. Mozier to supplement his previous testimony in light of these additional documents.

 Because the trial court has considerable discretion over discovery and the admissibility of evidence and whether or not to allow a plaintiff to hold open his case, the question before this Court is not whether it necessarily agrees with the course taken by the trial court. Rather, it must be determined if there was a reasonable basis for the action taken. The trial court plainly considered the fact that Mr. Hancock did not disclose the lab reports to the Shooks in discovery. It was not unreasonable for the trial court to tailor its remedy to the harm it perceived. *See State ex rel. Madlock v. O'Malley,* 8 S.W.3d 890, 891 (Mo. banc 1999).

> If letters or other documents are allowed in evidence after a trial starts for the sole reason that they were not obtained sooner by the party offering them, the rules of discovery and court orders pertaining thereto would become empty phrases signifying nothing. Trial by ambush would be reborn. Enforcement of discovery rules and orders is necessary to prevent abuse by future litigants.

*Klonoski v. Mahlab,* 156 F.3d 255, 271 (1st Cir.1998).

### 2.

 Mr. Hancock also argues that his failure to produce the records should be excused because they are "newly discovered evidence." To successfully claim new evidence, the offering party must show: 1) the evidence has come to the knowledge of the party since the trial; 2)

failure to discover the evidence sooner was not the result of a lack of due diligence; 3) the evidence is so material that a new trial would produce a different outcome; and 4) it is not cumulative only or merely impeaching the credibility of a witness. *State v. Westfall,* 75 S.W.3d 278, 284 (Mo. banc 2002). Here, the records would have been discovered with due diligence by Dr. Mozier, Mr. Hancock's expert witness. A cursory examination of Dr. Mozier's tickets would have revealed the missing date and should have raised the issue of a possible discrepancy about when the visit occurred. Mr. Hancock's counsel effectively admitted this when he told the court he "didn't think it was an issue...." The court responded, "If you looked at the tickets and saw there was no date on it, you should have known that could be an issue." The records Dr. Mozier found following his direct and cross-examinations were not new evidence.

### 3.

Although other remedies might have been chosen, failure to submit the two juror questions was not clearly against the logic of the circumstances, nor was it arbitrary and unreasonable. Furthermore, the records relied upon by Dr. Mozier in determining the date of the abortions was not new evidence. The trial court acted within its discretion. Point one is denied.

### B.

In his second point, Mr. Hancock claims that the trial court erred in allowing the Shooks to play portions of Mr. Hancock's videotaped deposition that reference a 1994 settlement letter. Mr. Hancock alleges further error when, after having ad-

---

7. We do not suggest that these more drastic remedies would have been appropriate in this factual context.

mitted discussions of a portion of the settlement letter, the court did not allow him to introduce the entire letter into evidence under the rule of completeness.

At trial the Shooks sought to play portions of Mr. Hancock's videotaped deposition. While testifying, Mr. Hancock referred to a number of documents in front of him on the conference table. One of these documents was a letter seeking compensation from Mr. Hancock's insurer for the culling of eleven dairy cows as a result of aflatoxicosis. However, this letter was never specifically identified to the jury or offered into evidence.

In the video, Mr. Hancock was asked a series of five questions concerning "eleven cows culled for slaughter." These questions dealt with whether or not the cows were pregnant when they were culled and for how long they had been milked. The only reference to the letter in the entire video was when Mr. Hancock was asked, "You're not able to tell us how many days those cows had been milked before?" He answered, "No, not by this letter, I sure couldn't."

## 1.

■ Because settlements are encouraged under the law, the general rule is that evidence procured from settlement is to be excluded at trial. *Owen v. Owen*, 642 S.W.2d 410, 414 (Mo.App.1982). *See also* IV JOHN HENRY WIGMORE, WIGMORE ON EVIDENCE § 1061 (1972). Such evidence is normally excluded because a party making a settlement offer should not be penalized by revealing an offer to the jury if negotiations fail. *Owen*, 642 S.W.2d at 414. *See also* WIGMORE. Allowing evidence of settlement and negotiation to come before the jury creates a possibility of bias that has no place in our system of justice. The jury could perceive the offering party as admit-

ting guilt or conceding harm and the jury could perceive the refusing party as stubborn, greedy, or mean spirited. The jury could also be confused by a compromise position acceptable for settlement, but less favorable than the result a party might seek at trial.

■ The evidence on the videotape and as presented to the jury does not suggest the type of injury that this rule is designed to protect. The jury was in no way made aware of any offer of settlement or any claim of insurance. As the evidence appeared on the videotape, Mr. Hancock was simply being asked questions regarding eleven culled cows. This Court was not provided with the complete deposition transcript. However, the appearance from the videotape is that Mr. Hancock offered independent testimony and merely used the letter to refresh his recollection. He was questioned:

Q: Now, of the eleven cows you refer to here that were sold for slaughter, none of those cows were pregnant when they were sold, correct?

A: Correct.

. . . .

Q: All right. So of the eleven cows that were sold, you weren't able to determine that any of them were in fact pregnant—

A: Correct.

. . . .

Q: You're not able to tell us how many days those cows had been milked before?

A: No, not by this letter, I sure couldn't.

. . . .

In none of the questions on the videotape was settlement of Mr. Hancock's claims discussed. Nor does it appear that Mr.

Hancock's statements reflected compromise positions.

The evidence presented to the jury did not risk the kind of harm against which the rule protects. It cannot be said that the trial court abused its discretion in allowing the videotape to be shown to the jury.

### 2.

When it became clear that the trial court was going to allow the deposition video to come into evidence, Mr. Hancock sought to have the entire settlement letter admitted under the doctrine of completeness. The court explained to Mr. Hancock that it would not allow the letter into evidence because to do so would present evidence of the actual negotiations to the jury. However, the court also informed Mr. Hancock that he could submit similar statements from the letter, so long as the statement could stand on its own and contained no reference to the settlement or insurance. Finally, the court advised Mr. Hancock that he could explain the difference in numbers between April 1992 and the end of 1992 during his rebuttal case.

Because Mr. Hancock offered independent testimony in the videotape played to the jury and because the court did not admit evidence of the settlement or admit the settlement letter into evidence, Mr. Hancock's claim under the doctrine of completeness is without merit. If no portion of the settlement came into evidence, then there is no basis to admit the remainder. Point two is denied.

### C.

Mr. Hancock next raises two issues. First, he alleges that he did not agree to the videotaping of George Parsons' deposition and that it was used without proper notice under the rules and resulted in the admission of false testimony. Second, Mr.

Hancock asserts that he was entitled to a new trial because George Parsons submitted an affidavit following the trial explaining that portions of his deposition testimony played for the jury were inaccurate.

### 1.

■ At trial, Mr. Hancock did not raise an objection that the deposition was videotaped improperly. Thus, this claim of error was not preserved for review.

### 2.

■ Following trial, George Parsons submitted an affidavit explaining that portions of his deposition testimony were inaccurate. Mr. Parsons swore:

2. Portions of my testimony in [this case] were inaccurate due to the following:

a. I was scheduled for open heart surgery and I did not have a chance to review the file.

b. I did not know until Friday 4/21/00 my deposition was going to be taken.

c. I was provided documents at my deposition by Ms. Craycroft, attorney for the Defendant, but only selected portions of the records for the Hancock dairy.

d. Because my deposition was taken by Ms. Craycroft in the eleventh hour, I did not have the opportunity to review the transcripts [sic] accuracy. To this date I have not seen the transcript.

3. Having reviewed all the records I now believe:

a. The Bolivar Ready Mix suit was filed in February 1998, and that I was last to the Hancock dairy on April 25, 1997.

b. At the time I was last at the dairy there were free standing walls but the

push off ramps to the pits were not completed.

c. I did not intentionally give any inaccurate testimony, and the purpose of this affidavit is to set the record straight.

Mr. Parsons' deposition testimony was only slightly different. Parsons testified that the last time he was on Hancock's land "was late '96, early '97." When asked if there was a push off ramp on the two pits Parsons testified, "I think there was. I can't recollect, but manure could have gone into the pit. .... [A]gain, having a hard time recollecting this. I was thinking that both [pits] were able to be—would have been able to be used." Mr. Parsons was never specifically asked, nor did he specifically testify as to the Bolivar Ready Mix lawsuit in his deposition testimony.

 It is within the sound discretion of the trial court to determine whether perjury occurred and whether an improper verdict resulted therefrom. *Hoodco of Poplar Bluff v. Bosoluke*, 9 S.W.3d 701, 704 (Mo.App.1999). *See also Clark v. McKeone*, 234 S.W.2d 574, 576 (Mo.1950) (holding that trial court did not abuse its discretion in overruling motion for new trial on perjury grounds). It is only in cases where the evidence clearly discloses that the trial court has abused its discretion that an appellate court will interfere with the judgment on this ground. *Hoodco*, 9 S.W.3d at 704. The granting of a new trial on perjury grounds requires a showing that the witness willfully and deliberately testified falsely. *Id.; see also Loveless v. Locke Distrib. Co.*, 313 S.W.2d 24, 32 (Mo.1958) ("And courts are, and should be, reluctant to order a new trial ... unless the after-trial facts ... are of such *decisive and conclusive character* as to render a different result reasonably certain." (emphasis in original) (internal quotations and citations omitted)). If testimony is determined to have been perjured, "[t]he determination of the materiality of alleged false testimony is a question of law for the determination of the court." *Loveless*, 313 S.W.2d at 31.

A review of the record reveals no evidence that Mr. Parsons willfully or deliberately testified falsely. The affidavit indicates that any inaccuracies were the result of a hastily scheduled and poorly prepared deposition rather than from any intent to deceive the court. In his deposition, each noted inaccuracy was prefaced with a statement such as "I think ..." or "I can't recollect ..." or "having a hard time recollecting ...." Finally, there is no evidence that the inaccurate testimony had any effect on the ultimate decision in the case. The trial court did not abuse its discretion in denying a new trial based upon the inaccuracies in Mr. Parsons' testimony. Point three is denied.

## D.

 Mr. Hancock also complains that the trial court erred in allowing the Shooks to read deposition excerpts and show videotaped excerpts without ruling on Hancock's objections or allowing Hancock's counter-designations to be read at the same time under the completeness doctrine.

At trial, the Shooks sought to introduce the prepared and edited videotaped deposition of George Parsons. On the morning the video was to be played for the jury, Mr. Hancock objected to playing the video without his counter-designations. The court responded, "Well, I'll let [the Shooks] play [the] video and then you can read those parts of the depo that you want to read in. I'm not going to prevent [the Shooks] from playing the depo because you two didn't agree what should go in and what shouldn't." The court went on to

say, "Whatever your understanding was ... the problem is we're sitting here waiting for the jury to come in and watch it. I can't fix that right now." The court concluded, " ... I don't know any way to fix it other than let [the Shooks] play [the] video and then let you read the parts that you want to read."

The trial court's discretion over the admissibility of evidence extends to the admissibility of deposition testimony. *Kunzler v. Kunzler's Estate*, 598 S.W.2d 139, 145 (Mo. banc 1980). *See also Still v. Ahnemann*, 984 S.W.2d 568, 573–74 (Mo. App.1999). The trial court faced a situation where it could postpone the presentation of the evidence and require the Shooks to re-edit the videotape with Mr. Hancock's designations or let the evidence proceed with Mr. Hancock reading his designations to the jury. The trial court did not abuse its discretion in choosing the more efficient option. Point four is denied.

### E.

Mr. Hancock alleges that the trial court erred in refusing to allow him to testify that he knew his herd was suffering from aflatoxicosis because he had visited another local herd with a known aflatoxin problem and alleges that a farmer may be qualified to express opinions regarding his animals.

Before trial, the court granted the Shooks' motion in limine excluding any evidence of the case *Thomas Sanders and Helen Sanders v. Hartville Milling Company, et al.* When arguing the motion in limine, Mr. Hancock argued that he should be allowed to testify that he had visited the Sanders' herd, which had a known aflatoxin problem, and that the visit supported his diagnosis that aflatoxin caused the poor condition of Hancock's herd. Mr. Hancock argues that, as a farmer, he is

qualified to express his opinion on the cause of damages to his herd. However, Mr. Hancock never sought to introduce such evidence at the trial, nor did he make an offer of proof.

The court's ruling on a motion in limine is interlocutory and subject to change during the course of the trial. *State v. Cole*, 71 S.W.3d 163, 175 (Mo. banc 2002). A motion in limine, by itself, preserves nothing for appeal. *Id.* "The proponent of the evidence must attempt to present the excluded evidence at trial . . . ." *Id.* If the evidence remains excluded, the proponent must then make an offer of proof. *Id.*

Mr. Hancock did not attempt to present the excluded evidence at trial or make an offer of proof; thus, he did not preserve the issue for appeal. Point five is denied.

### F.

Mr. Hancock asserts that the court erred in striking his negligence *per se* count, in dismissing his negligence count, and in giving the Shook's withdrawal instruction.

#### 1.

The Court declines review of this point as it relates to the negligence *per se* and negligence counts. The jury found for Mr. Hancock on his strict liability / implied warranty claim and there is no evidence that the measure of damages would have been different. As to these issues, point six is denied.

#### 2.

At the instruction conference, the parties discussed the withdrawal instruction, which stated, "The issue of failure to test the feed is withdrawn from the case and you are not to consider such issue in arriving at your verdict." Mr. Hancock argued

that the withdrawal instruction was improper because it could confuse the jury. Mr. Hancock claimed the jury could determine that the feed was contaminated due to failure to test the feed and find for the Shooks, even though he had met his burden. The court replied that it would submit the instruction "because failure to test the feed is not an element that this jury has to find to render a verdict on behalf of Plaintiff under Instruction No. 6. It has been discussed in this case. And I will submit . . . the withdrawal instruction."

▮▮▮▮ The trial court may withdraw an issue when the evidence presented on the issue is inadequate for submission to the jury. *Still v. Ahnemann,* 984 S.W.2d 568, 575 (Mo.App.1999). The risks associated with the withdrawal of an issue are inevitable and must be considered by plaintiffs in the planning and presentation of their claims. *Id.* "We know of no authority suggesting that the trial court has an obligation to consider the possibility that the withdrawal of part of a claim for damages may have a negative impact upon plaintiff's credibility." *Id.* Even if such were true, relief could be granted only if the withdrawal had such a profound effect on the plaintiff's credibility as to have influenced the jury's verdict on liability. *Id.*

As noted in *Still,* the risks of withdrawal are inevitable and must be considered in the planning and presentation of a case. *Id.* Mr. Hancock risked withdrawal when he presented the negligence issue to the jury and failed to meet his burden in showing a duty to test the feed. In any event, it is clear that the jury was not confused by the withdrawal instruction, as Mr. Hancock feared, for they returned a verdict in his favor. The trial court did not err in submitting the withdrawal instruction. Point six is denied.

## G.

In his seventh and eighth points on appeal, Mr. Hancock alleged errors relating to "several pretrial rulings"[8] and "several other pretrial and trial rulings."[9] These claims of error are numerous, but not particularly noteworthy, claims concerning the court's rulings on motions in limine and other evidentiary matters. As previously noted, the trial court retains broad discretion over the admissibility of evidence and such rulings will not be overturned absent a clear showing of abuse of that discretion. *State v. Winfield,* 5 S.W.3d 505, 515 (Mo. banc 1999). Nothing in Mr. Hancock's brief nor in the record leads to the conclusion that the trial court abused its discretion concerning these evidentiary rulings. Points seven and eight are denied.

## IV.

For the foregoing reasons, the judgment is affirmed.

WHITE, WOLFF, BENTON, STITH, and TEITELMAN, JJ., concur.

LIMBAUGH, C.J., dissents in separate opinion filed.

STEPHEN N. LIMBAUGH, JR., C.J., dissenting.

I respectfully dissent.

I would hold that it was an abuse of discretion to prohibit Dr. Mozier from testifying that he found records confirming that the date of his farm visits regarding the three aborted cows occurred after the cows' ingestion of aflatoxin-contaminated feed. The prejudice is clear because the testimony went to the heart of the case—whether the culling of 126 cows from the

---

8. Point seven.

9. Point eight.

herd, of a value of some $600,000, was necessitated by the aflatoxin incident. Moreover, there is no doubt the evidence was critical to the jury's deliberation in view of the jury questions submitted at the end of the case as a follow-up to Dr. Mozier's response to the initial jury questions.

The crux of the majority's position is that the trial court's decision prohibiting the testimony was justified as a sanction for a discovery violation. According to the majority, because Dr. Mozier was a retained expert under plaintiffs' "control," plaintiffs were under a duty to produce all relevant materials in Dr. Mozier's possession, and the lab reports in particular, despite the fact that plaintiffs had no knowledge of the existence of the reports. In my opinion, however, it is not at all clear that plaintiffs violated their discovery obligations by Dr. Mozier's failure to disclose the reports.

The discovery rule relied on by the majority, Rule 58.01(a), provides that a party to a suit is required to furnish upon request any relevant material that it has in its "possession, custody, or control." The majority concedes that plaintiffs had no possession or custody of the records in question and no actual control of the records. Instead, the majority appears to rely on a theory of imputed, or constructive, control. Though I agree that the rule contemplates imputed or constructive control under some circumstances, I question whether the rule applies where plaintiff did not even know of the existence of the records. In addition, the control factor must be discounted further by the fact that plaintiffs gave defendants an authorization form allowing defendants to seek the records directly from Dr. Mozier, so that the records were equally available to both sides. *See Brotherton v. Burlington Northern R.R.,* 672 S.W.2d 133, 136 (Mo. App.1984).

In effect, the majority fashions a new rule that all materials and information held by an expert witness, even an expert who, like Dr. Mozier, is also a fact witness, *see Brandt v. Medical Defense Associates,* 856 S.W.2d 667, 673 (Mo. banc 1993), is always under the control of the party calling the expert. I have found no Missouri case directly supporting the new rule. The cases cited by the majority on the control question are either out of context or applicable only by extrapolation. *State v. Whitfield,* 837 S.W.2d 503 (Mo. banc 1992), is a death penalty case that turns on criminal procedure Rule 25.03, a discovery provision that is much more comprehensive and demanding than the civil rules counterpart. Furthermore, unlike the case at hand, there was no question that the state had exclusive "control" of the witness and the coat with bullet holes worn by the witness because she was one of the victims of the crime. *State ex rel. Tracy v. Dandurand,* 30 S.W.3d 831 (Mo. banc 2000), stated only that a party has "control" over an expert witness in the sense that the party can elect whether to call the expert at trial, and that records given by the party to the expert are still subject to the attorney-client privilege if the expert is not designated as a trial witness. *State ex rel. American Economy Ins. Co. v. Crawford,* 75 S.W.3d 244 (Mo. banc 2002), makes no mention of the control question except to repeat *Tracy's* statement that a party has control over its expert witnesses and, interestingly, to characterize the statement as dicta. *Id.* at 246. Finally, the federal First Circuit cases *Ortiz–Lopez v. Sociedad Espanola de Auxilio Mutuo y Beneficiencia de Puerto Rico,* 248 F.3d 29 (1st Cir.2001), and *Klonoski v. Mahlab,* 156 F.3d 255 (1st Cir.1998), are distinguishable because neither case involved an authorization form given to the party seeking discovery so as to afford both parties equal access.

In short, I am skeptical that under our rules, Dr. Mozier's failure to disclose the records constitutes a discovery violation that should be charged to plaintiffs. Plaintiffs, themselves, did not have actual possession, custody or control of the records, much less knowledge of the existence of the records. In fact, had any of the parties known of the existence of the records, they were equally available to all. Even if there was a technical discovery violation charged to plaintiffs, the circumstances here preclude the harsh sanction imposed by the trial court. Given the critical nature of the testimony, the fact that by all accounts Dr. Mozier's failure to disclose was inadvertent, not intentional, and further, the need to balance the vigilant enforcement of the rules of discovery with an abiding concern for a truth-seeking process, the trial court should have sought an alternative solution. The proper recourse was to have allowed the testimony after affording defendants sufficient time to examine the reports, depose Dr. Mozier and prepare for cross-examination. After all, this is not a case in which plaintiffs were "sandbagging" the defendants, withholding evidence in order to surprise the defendants at trial. Nor is this a case in which the late disclosure of the evidence gave rise to the need for an independent investigation to determine the veracity of the evidence, or the need to secure expert testimony to contravene the evidence. Indeed, even from a strategic standpoint, defendants would have suffered no prejudice because their defense of lack of causation, and their evidence in support of that defense, would have been the same with or without the introduction of Dr. Mozier's records.

For these reasons, I would reverse and remand for a new trial.